## UNITED STATES *v.* SHIMER.

No. 392.   Argued April 27, 1961.—Decided June 12, 1961.

*Wayne G. Barnett* argued the cause for the United States. With him on the briefs were former *Solicitor General Rankin, Solicitor General Cox, Assistant Attorney General Orrick, Assistant Attorney General Doub, Alan S. Rosenthal, Anthony L. Mondello, Pinckney G. McElwee* and *Morton Hollander.*

The cause was submitted on brief by *Edward Davis* for respondent.

*William F. McKenna* and *Samuel E. Neel* filed a brief for the National Association of Mutual Savings Banks et al., as *amici curiae,* urging reversal.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The United States brought this action in the Eastern District of Pennsylvania to recover from Shimer, on theories of subrogration and indemnity, an amount of $4,000 which the Veterans' Administration, as guarantor of a loan made to him by Excelsior Saving Fund and Loan Association, had paid to that institution.

The relevant facts, as stipulated by the parties, are these: In 1948 Shimer, a World War II veteran, borrowed $13,000 from Excelsior secured by a mortgage upon residential realty which Shimer purchased with the proceeds. At Shimer's request the Veterans' Administration, pursuant to Title III of the Servicemen's Readjustment Act of 1944, as amended in 1945,[1] granted a maximum guarantee of the loan—that is, the lesser of $4,000 or 4/13 of the indebtedness outstanding at any particular time.[2] Both

---

[1] 58 Stat. 291, as amended by 59 Stat. 626.

[2] "SEC. 500. (a) Any person who shall have served in the active military or naval service of the United States at any time on or after September 16, 1940, and prior to the termination of the present war . . . shall be eligible for the benefits of this title. Any loan made by such veteran within ten years after the termination of the

the "Home Loan Report" signed by Shimer, and the Administration certificate of guaranty, specified that the rights of the parties would be governed by Regulations of the Administration in effect at the date of the loan and guaranty. Shimer defaulted in 1948, and in 1949 Excelsior, as mortgagee, notified the Veterans' Administration of his default and obtained a Pennsylvania judgment foreclosing the mortgage which then secured a debt in excess of $13,000.[3] After the property was purchased by Excelsior at a sheriff's sale for $250, the Veterans' Administration paid it the entire guaranty of $4,000 and brought the present action against Shimer.

In the Court of Appeals, the United States chose to rely exclusively on the Administration's alleged right of indemnity against Shimer, and accordingly does not press its claim here upon a theory of subrogation. The Court of Appeals held that the United States was not entitled to recover, reaching this result by applying a well-established principle of surety law which both parties agree was recognized by Congress when it passed Title III: The Veterans' Administration, as guarantor, could not recover from its principal, Shimer, any amount it was not obli-

war for any of the purposes, and in compliance with the provisions, specified in this title, is automatically guaranteed by the Government by this title in an amount not exceeding fifty per centum of the loan: *Provided,* That the aggregate amount guaranteed shall not exceed . . . $4,000 in the case of real-estate loans . . . .

"(b) Loans guaranteed under this title shall be payable under such terms and conditions as may be agreed upon by the parties thereto, subject to the conditions and limitations of this title and the regulations issued pursuant to section 504: *Provided,* That the liability under the guaranty within the limitations of this title shall decrease or increase pro rata with any decrease or increase of the amount of the unpaid portion of the obligation . . . ."

[3] The computation of the amount of the unpaid debt and the amount consequently owing on the guaranty will be open for further consideration by the District Court on the remand which will result from this opinion.

gated to pay the mortgagee, Excelsior, on his behalf. Turning to state law to determine the extent of the Administration's obligation to Excelsior, the court below considered that under Pennsylvania law both Shimer and the Veterans' Administration had been released from any further liability to Excelsior at the time the Administration paid its $4,000 guarantee, that is, after the foreclosure sale. 276 F. 2d 792. Under the Pennsylvania Deficiency Judgment Act [4] a mortgagee who purchases the mortgaged property in execution proceedings cannot recover a deficiency judgment unless and until the mortgagee obtains a court determination of the fair market value of the mortgaged property and credits that amount to the unsatisfied liability. When, as eventuated in this case, the mortgagee fails to bring a proceeding for this purpose within six months after the foreclosure sale, the debtor and guarantor are permanently discharged.

We granted certiorari, 364 U. S. 889, to pass upon the contentions of the United States that: (1) the application of state law to determine the Administration's obligation to Excelsior is inconsistent with the Regulations prescribed by the agency charged with administering the Servicemen's Readjustment Act; (2) these Regulations are authorized by the federal enactment; and (3) a right of indemnity under federal law arises in favor of the Veterans' Administration upon proper payment of its obligations as guarantor.

I.

The Regulations promulgated by the Veterans' Administration make clear that they were intended to create a uniform system for determining the Administration's obligation as guarantor, which in its operation would displace state law. Section 36.4321, 12 Fed. Reg. 8344, in

---

[4] Purdon's Pa. Stat., Tit. 12, §§ 2621.1–2621.11.

subsection (a) [5] implements the "pro rata" requirements of § 500 (b) of the statute, Note 2, *supra,* and establishes the procedure for computing the amount of the guaranty which the mortgagee can, under § 506 of the statute, demand to have applied against his unpaid claim on the date of default.[6] In this instance it is agreed that such amount is $4,000. However, we are informed by the Solicitor General that the mortgagee is both allowed and encouraged to delay collecting on the guaranty until after all events which may lead to a government offset have taken place. The Administration's potential right as subrogee to some portion of the proceeds of a foreclosure sale is such a possible offset. Accordingly, Excelsior waited until after the foreclosure sale to collect on the guaranty. This brought Excelsior within subsection (b) of § 36.4321 which provides that "Credits accruing from the proceeds of a sale . . . of the security subsequent to the date of computation [pursuant to subsection (a), *supra*], and prior to the submission of the [guaranty] claim" shall be applied in reduction of the outstanding debt and "the amount payable on the claim shall in no event exceed the remaining balance of the indebtedness."

---

[5] Section 36.4321 (a) provides in relevant part:

*"Computation of guaranty claims; subsequent accountings.* (a) Subject to the limitation that the total amounts payable shall in no event exceed the amount originally guaranteed, the amount payable on a claim for the guaranty shall be the percentage of the loan originally guaranteed applied to the indebtedness computed as of the date of claim but not later than (1) the date of judgment or of decree of foreclosure . . . ."

[6] Section 506 of the Act provides: "In the event of default in the payment of any loan guaranteed under this title, the holder of the obligation shall notify the Administrator who shall thereupon pay to such holder the guaranty not in excess of the pro rata portion of the amount originally guaranteed, and shall be subrogated to the rights of the holder of the obligation to the extent of the amount paid on the guaranty . . . ."

It was at this point that the Court of Appeals applied the Pennsylvania Deficiency Judgment Act to determine the "Credits accruing from the proceeds of . . . [the foreclosure] sale." However, the method of determining these credits is also specified in the Regulations, indeed spelled out in § 36.4320, 13 Fed. Reg. 7739–7741, in such great detail that there can be little doubt of an administrative intent that such method should provide the exclusive procedure.[7] In substance, that section provides that in every case at least the amount realized at the foreclosure sale is to be credited. It also specifies the way in which the Veterans' Administration can require the mortgagee to credit more than the amount received at the foreclosure sale and thereby protect itself against the very risk the Pennsylvania Deficiency Judgment Act was designed to alleviate—the risk of having to make good its guaranty simply because the mortgaged property is sold for an inadequate price at a judicial sale. The Administrator is authorized to "specify in advance of such sale the minimum amount which shall be credited to the indebtedness of the borrower on account of the value of the security to be sold." The mortgagee must then reduce the balance of the unpaid debt by at least this minimum amount before collecting on the guaranty.

---

[7] Section 36.4320 (whose length and intricacy is such as to make impracticable its spreading in this opinion) was amended in particulars not here relevant and was generally clarified between the dates of the loan and guarantee and the dates of foreclosure and sale. We consider applicable the later wording in light of § 36.4300 of the Regulations which was in effect at the date of the loan and which provided:

"*Applicability.* The regulations in this part and amendments thereto shall be applicable to each loan entitled to an automatic guaranty, or otherwise guaranteed or insured, on or after the date of publication thereof in the FEDERAL REGISTER, and *shall be applicable to such loans previously guaranteed or insured to the extent that no legal rights vested thereunder are impaired.*" (Emphasis added.) 12 Fed. Reg. 8342.

The mortgagee has the option, however, of selling any property it purchased at or below this minimum amount to the Veterans' Administration for the specified minimum amount. If, as in the present case, the Administrator does not specify a minimum amount "the holder [mortgagee] shall credit against the indebtedness the net proceeds of the sale . . . ."

In effect, then, the scheme set up by the Regulations provides the Veterans' Administration with a measure of assurance that there shall be credited against the unpaid debt at least what the Administrator regards as the fair value of the mortgaged property. In terms of the present case: With an unpaid balance of indebtedness of $13,000, the Veterans' Administration should not have to pay its full guaranty of $4,000 unless the property which Excelsior may retain is worth less than $9,000. If Excelsior purchased property worth $10,000 for $250 at the foreclosure sale, the Administration should not have to pay more than $3,000 on its $4,000 guaranty, or, to state the matter more precisely, the Administration should realize a $1,000 credit as set off against its $4,000 guaranty which Excelsior could have claimed at the time of default. Accordingly, if the Administrator regarded the mortgaged property as worth $10,000 he could have specified (which he did not) a minimum credit (or "upset price") of that amount which Excelsior would then have had to credit against the $13,000 unpaid debt. If Excelsior had purchased the property for $10,000 or less, it would have had an option to reconvey the property at a valuation of $10,000 to the Veterans' Administration.

This scheme of protection, while intended to remedy the same abuses at which the Pennsylvania Deficiency Judgment Act is directed, is, of course, inconsistent with the Pennsylvania procedures which provide for a judicial determination of the amount to be credited against an

outstanding debt and do not obligate the guarantor to purchase the mortgaged property at its judicially determined value. We have no doubt that this regulatory scheme, complete as it is in every detail, was intended to provide the whole and exclusive source of protection of the interests of the Veterans' Administration as guarantor and was, to this extent, meant to displace inconsistent state law.[8]

## II.

We think that the Servicemen's Readjustment Act authorized the Veterans' Administrator to displace state law by establishing these exclusive procedures.[9] In this regard it is important to recall the scope of our review in a case such as this. More than a half-century ago this Court declared that "where Congress has committed to

---

[8] This conclusion is fortified by § 36.4320 (d) which specifically excludes and waives one type of state protection of guarantors and lenders which otherwise would have seemed to fit the other provisions of the section. Subdivision (d) provides:

"If a minimum bid is required under applicable State law, or decree of foreclosure or order of sale, or other lawful order or decree, the holder may bid an amount not exceeding such amount legally required. If an amount has been specified by the Administrator and the holder is the successful bidder for an amount not exceeding the amount legally required, such specified amount shall govern for the purposes of this section and for the purpose of computing the ultimate loss under the guaranty or insurance. In the event no amount is specified and the holder is the successful bidder for an amount not exceeding the amount legally required, the amount paid or payable by the Administrator under the guaranty shall not be subject to any adjustment by reason of such bid."

[9] Section 504 of the Act provides: "The Administrator is authorized to promulgate such rules and regulations not inconsistent with this title, as amended, as are necessary and appropriate for carrying out the provisions of this title, and may delegate to subordinate employees authority to issue certificates, or other evidence, of guaranty of loans guaranteed under the provisions of this title, and to exercise other administrative functions hereunder."

the head of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involve questions of law or fact, will not be reviewed by the courts, unless he has exceeded his authority or this court should be of opinion that his action was clearly wrong." *Bates & Guild Co.* v. *Payne,* 194 U. S. 106, 108–109. This admonition has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. See, *e. g., National Broadcasting Co.* v. *United States,* 319 U. S. 190; *Labor Board* v. *Hearst Publications, Inc.,* 322 U. S. 111; *Republic Aviation Corp.* v. *Labor Board,* 324 U. S. 793; *Securities & Exchange Comm'n* v. *Chenery Corp.,* 332 U. S. 194; *Labor Board* v. *Seven-Up Bottling Co.,* 344 U. S. 344.

In the present case we need only consider the statutory authorization for § 36.4320 (a) (4) which provides that "If a minimum amount [the upset price] has not been specified by the Administrator . . . the holder shall credit against the indebtedness the net proceeds of the sale . . . ." It would, of course, have been possible for the Administrator to have promulgated regulations consistent with much of the present scheme which would have, in addition, accepted the benefits of local law which tended further to reduce a guarantor's risk of loss from sale of the mortgaged property at an inadequate price. Thus, with specific reference to the Pennsylvania Deficiency Judgment Act, there would have been nothing inherently illogical about administrative regulations providing for an "upset price" device and then adding that, in situations where the "upset price" technique was not used by the Administrator, the Veterans' Administration

was to be entitled to the benefits of the state judicial assessment of the value of property purchased by the mortgagee. However, the Veterans' Administrator has chosen not to take advantage of laws like that of Pennsylvania. If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

It is doubtless true that the policy of the Act is, broadly stated, to enable veterans to obtain loans and to obtain them with the least risk of loss upon foreclosure, to both veteran and the Veterans' Administration as guarantor of the veteran's indebtedness, and it is equally clear that had the Regulations adopted or included the provisions of the Pennsylvania Deficiency Judgment Act this would have furthered at least the second of these purposes. However, there are also ample indications both in the Act and in its legislative history that Congress intended the guaranty provisions to operate as the substantial equivalent of a down payment in the same amount by the veteran on the purchase price, in order to induce prospective mortgagee-creditors to provide 100% financing for a veteran's home.[10] The Regulations which the Administrator has adopted provide what the agency could allowably view as a more effective reconciliation of these twofold ends than might be accomplished by a complete or partial adoption of the law of a State such as Pennsylvania.

---

[10] See, *e. g.*, H. R. Rep. No. 1418, 78th Cong., 2d Sess., pp. 3, 9; Hearings before Subcommittee of the Senate Committee on Finance on H. R. 3749, 79th Cong., 1st Sess., pp. 31–33 (General Omar Bradley).

The Regulations assure a Pennsylanvia mortgagee-creditor that he will be able either to recover the full amount of the guaranty or to sell the mortgaged property to the United States and recover the amount of its loss after such sale. For example, in the present situation Excelsior knew that it could either recover $4,000 from the Veterans' Administration and keep the mortgaged property, or that it could sell the mortgaged property to the United States, recovering on its guaranty the amount by which the unpaid debt exceeded the price which the United States had paid. The only risk of loss with which Excelsior would have been faced was the risk of having on its hands a property worth less than $9,000 to secure a residual debt of $9,000 (after the United States had paid $4,000 of the total debt of $13,000). This is precisely the risk which Excelsior would have had to assume had it insisted upon a $4,000 down payment by the veteran and lent $9,000 on the property. Presumably therefore it was willing to accept a $4,000 guarantee under the Administrator's Regulations in exchange for a $4,000 down payment.

In contrast, a mortgagee whose federal guaranty was subject to the law of a State such as Pennsylvania would be subjected both to an additional cost and to an additional risk, neither of which is present when there is an equivalent down payment. The additional cost is that required in every case to litigate the value of the mortgaged property. The additional risk is that, if it was judicially determined that the property was worth more than the amount for which the mortgagee could in fact sell it, the mortgagee would have to absorb the cost of the judicial error and could recover on its guaranty only the difference between the unpaid debt and the amount of the judicial estimate of the value of the property. Thus if the value of the mortgaged property in the present case had been judicially assessed at $10,000, Excelsior, after

payment of the resulting $3,000 on the guaranty, would have been left with the mortgaged property in place of an unrequited $10,000 loan, whereas had it insisted on a $4,000 down payment from the veteran it would have had the mortgaged property to stand for a $9,000 loan.[11]

We cannot say that a Pennsylvania lender would not prefer a down payment to a guaranteed loan in the same amount if the Pennsylvania Deficiency Judgment Act were applicable. Nor can we say that the Administrator has unreasonably sacrificed either the Government's or the veteran's protection in relying exclusively on the "upset price" device in order to preserve the interchangeability of a guaranty with a down payment. The Veterans' Administration can and does protect itself from a sale at an inadequate price by specifying the minimum credit which the mortgagee must subtract from the unpaid debt. In protecting itself it also places its own financial resources behind the debtor-veteran who may be forced to reimburse the Administrator only if the Administrator considers that the property has been sold at a fair price, and who retains all the benefits of state law as against the mortgagee.

We consider the Regulations to be a reasonable accommodation of the statutory ends, first, of making a federal guaranty the substantial equivalent of a down payment, and, second, of protecting both the Veterans' Administration and the veteran from unnecessary loss on a foreclosure sale. And since we find nothing in the statute or the legislative history antagonistic to this accommodation, we hold the Regulations to be a valid exercise of the authority granted the Administrator in § 504 of the Servicemen's Readjustment Act (note 9, *supra*).

---

[11] Pennsylvania law does not require a mortgagee who purchases the mortgaged property at a foreclosure sale for an amount less than the unpaid debt to return any portion of the down payment pursuant to a judicial assessment of the value of the property.

## III.

Respondent's final contention is that even though the Veterans' Administration was obligated on its guaranty to Excelsior, the Administration nevertheless had no right to indemnity from him. It is argued, first, that under the Act the Administration, in circumstances like these, can recover over against the veteran only on a theory of subrogation to the mortgagee's rights. The Administrator having proceeded in this instance simply on a theory of indemnity, it is claimed that there is no statutory authorization for the present suit.

Prior to the amendment of the Act in 1945, it was assumed that the ordinary concomitants of a guaranty relationship would follow upon the mere authorization of Government guaranteed loans and that these included the guarantor's right of indemnity. Restatement of the Law of Security, § 104; Decisions of the Administrator of Veterans' Affairs, No. 625, Vol. 1, p. 1154. The 1945 amendments made explicit that payment of the guaranty would be due on the veteran's default and that thereupon the Administrator "shall be subrogated to the rights of the holder of the obligation to the extent of the amount paid on the guaranty."

It is argued that this amendment, by negative implication, overruled or rejected what the Administrator had previously regarded as his independent right to indemnity, but surely this is carrying a negative implication too far. We cannot agree that Congress, without any statutory reference to the problem and without any discussion of it, intended to relieve the veteran of direct liability for amounts properly paid on his behalf by the Veterans' Administration. Not only might such a waiver of a guarantor's normal rights require a more burdensome route to recovery over from the principal, but it would deprive the guarantor of any recovery on occasions when

the mortgagee's rights were limited as against the debtor by state law, yet were protected against the Administrator by state or federal law. Relief from liability in these circumstances would convert a guaranty into a grant of aid. But the entire history of the "home loan" provisions of the statute is inconsistent with an intent to make outright grants, rather than loans of cash (S. 1767, 78th Cong., 2d Sess.) or credit, to returning servicemen.

Moreover, the recognition of a loss to the guarantor merely because of a failure of the lender's rights against the principal is incompatible with the background of general surety law against which the statute was drawn. See, *e. g., Leslie* v. *Compton,* 103 Kan. 92, 172 P. 1015. Indeed, at the time of the 1945 amendments to the Act the Administrator had already ruled that there was a right to recover over against the veteran on a theory of indemnity in situations where recovery by way of subrogation was barred by state law. Decisions of the Administrator of Veterans' Affairs, No. 625, Vol. 1, p. 1154.

For these reasons, we are constrained to agree with the uniform construction of the lower courts, including that of the two courts below, that the statute affords an independent right of indemnity to the Veterans' Administration. See *United States* v. *Shimer,* 276 F. 2d 792; *McKnight* v. *United States,* 259 F. 2d 540; *United States* v. *Jones,* 155 F. Supp. 52; *United States* v. *Gallardo,* 154 F. Supp. 373; *United States* v. *Henderson,* 121 F. Supp. 343.

Finally, we find untenable respondent's argument that the applicable Regulation does not support recovery because there was no debt due *from the veteran* at the time of payment on the guaranty. Section 36.4323 (e), 11 Fed. Reg. 2123, provides: "Any amounts paid by the Administrator on account of the liabilities of any veteran guaranteed or insured under the provisions of the act shall constitute a debt owing to the United States by such veteran." The Regulation is merely declaratory of

a surety's customary right of indemnity for amounts paid pursuant to an obligation of the guarantor assumed with the consent of the principal. Restatement of the Law of Security, § 104. This right is in general unaffected by defenses of the principal which are not available to the guarantor.[12] Simpson, Suretyship, at p. 227; Stearns, Law of Suretyship, § 284. The Regulation certainly indicates no purpose to depart from the general rule in the case of guaranties by the Veterans' Administration.[13]

The judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS would affirm the judgment for the reasons stated by the Court of Appeals, 276 F. 2d 792.

---

[12] Moreover, at the time the Veterans' Administration became liable on its guaranty (*i. e.*, on the veteran's default and prior to the foreclosure sale, see notes 5 and 6, *supra*) the Administration and the respondent veteran had no defenses to payment either under state law or under the Regulations of the Administrator.

[13] This is made particularly clear by the form of the Regulation which was the predecessor of 11 Fed. Reg. 2123. The earlier Regulation, 9 Fed. Reg. 12655, provided:

"(a) Any amounts paid to the creditor by the Administrator pursuant to the guaranty shall constitute a debt due to the United States by the veteran on whose application the guaranty was made . . . ."