UNITED STATES of America, Plaintiff,

v.

Thomas J. CAPRICE, Defendant.

Civ. No. 988–69.

United States District Court,
D. New Jersey.

Dec. 11, 1974.

Jonathan L. Goldstein, U. S. Atty. by Carolyn E. Arch, and James A. Plaisted, Asst. U. S. Attys., Newark, N.J., for plaintiff.

Frank P. Marano, East Orange, N.J., for defendant.

BIUNNO, District Judge.

In this mortgage foreclosure case, the mortgage debtor raises two points, the application of which depends on whether New Jersey law governs.

One is N.J. Court Rule 4:27–2, which by the exception referring to N.J.S. 2A:50–2, forbids joinder in one action of the remedy of foreclosure of the mortgage and the remedy of a deficiency money judgment on the bond if the proceeds of sale do not satisfy the debt. (The exception probably should refer to N.J.S. 2A:50–1, or to both sections).

The second is whether the mortgage debtor is entitled here to have the deficiency judgment reduced by the difference between the "fair value" of the property and the amount realized at the sale.

■ The decisions hold that where the United States is the holder of the mortgage, whether by assignment or otherwise, the proceeding is governed by federal law and not by the law of the State where the property is located, since the issue involves federal rights and liabilities stemming from a federal program. See *U. S. v. Wells,* 403 F.2d 596, at 598 (CA 5th, 1968); *Clearfield*

*Trust Co. v. U. S.,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *U. S. v. Shimer,* 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961); *U. S. v. McIntyre, etc.,* 343 F.Supp. 1095 (M.D.La.1972). As noted in *Wells,* the application of federal law "is particularly needed to assure the uniform administration of the nationwide Veterans Administration loan program."

■ F.R.Civ.P. 18(b), which corresponds to N.J. Court Rule 4:27–2, expresses no exception for foreclosures on bond and mortgage, and the two remedies may be joined in one action. The end result, however, is the same, because when these remedies are joined, the practice is to handle the case in two stages. The first is the foreclosure, which involves establishment of the total debt due, foreclosure of the right of redemption as well as the rights of subordinate interests, and a sale of the property. The second step is to determine the deficiency, if any, and enter a money judgment accordingly. That sequence was used in this case. The late Judge Robert Shaw entered the judgment of foreclosure, and the matter now has come on for trial before the court without a jury, to establish the deficiency.

Since New Jersey law does not apply, there seems to be no reason why the United States could not, if it so chose, simply sue the debtor on the bond for a money judgment without foreclosing the mortgage at all. If this were done, of course, satisfaction of the money judgment would entitle the mortgage debtor to a warrant for satisfaction of the judgment and to a discharge or release of the mortgage lien, leaving him with whatever interest he may have in the property mortgaged as security.

This course can be followed under New Jersey law when the obligation of the debt is evidenced by a note (a "promise" to pay money, usually not under seal, for which the statute of limitations is 6 years), rather than a bond (an "obligation" to pay a penalty if a specified condition is not met, usually under seal, for which the statute of limitations is 16 years). See *79–83 Thirteenth Ave., Ltd., v. De Marco,* 44 N.J. 525, 210 A.2d 401 (1965).[1]

The provisions of N.J.S. 2A:50–2 have been indicated as designed to provide the mortgage debtor with a personal privilege, rather than to express some concept of public policy. See *Guarantee Trust v. Hoffman,* 16 N.J.Misc. 340, at 342, 199 A. 781 (Cir. 1938), and the precedents there cited.

As a matter of public policy, the experience of the great depression suggests that foreclosure might well be the remedy of last resort, instead of the required first step. Lenders make mortgage loans in the expectation that they will be paid according to their terms. The providing of security is a factor that helps justify making the loan, and commands a lower interest rate than unsecured loans. Borrowers who are conscious of the cost of money will offer the lender additional security, such as a collateral assignment of in force life insurance, or of sound securities already owned, in order to bargain better loan terms.

And the lender has no desire to foreclose. Foreclosure involves unwanted risks of loss not only of interest but of principal as well, and allowances for losses must be made up

---

1. At common law, the presence or absence of a seal, as well as the form, appears to have distinguished a bond from a note. Traditionally, a bond recited that the obligor was "held and firmly bound unto" the obligee, to pay a specified "penal sum" unless some specified condition were satisfied, and it was under seal. See *Ordinary v. Connolly,* 75 N.J.Eq. 521, at 524, 72 A. 363 (Prer.1909). A note is merely a promise to pay money, not under seal. The bond evidently has its origin in the common law, while the note, like the bill of exchange, the draft, and other kinds of "paper" have their origin in the law merchant. The presence or absence of negotiability, the presence or absence of security, and the like, have no bearing on the distinction.

Later on, various statutory changes tend to blur the distinction. Thus, sec. 6(4) of the Uniform Negotiable Instruments Law declared that the validity and negotiable character of an "instrument" were not to be affected by the fact that it bore a seal. See, *Clarke v. Pierce,* 215 Mass. 552, 102 N.E. 1094 (1913). A "bond simple" was a bond without a condition, and hence a "note under seal." See *Ballentine's Law Dictionary.*

in the level of interest rates charged to borrowers generally.[2]

Before the great depression, mortgage loans were made customarily in a form that called for the payment of interest only until the debt was due. The terms often ran for 3 or 5 years, and the loan was periodically extended with an adjustment in interest rates to reflect then current levels, much as is customary today with short term paper (e. g., U.S. Treasury bills, certificates of deposit issued by banks, and commercial paper). In a period of economic depression, many borrowers are wholly unable to satisfy the entire principal at one time, and a rule like New Jersey's results in wholesale foreclosures and the attempted sale of large numbers of parcels at one time. The laws of supply and demand force values down and the end result is that everyone loses badly.

During the 1930's the direct amortization mortgage, with level monthly payments toward interest and principal, became the rule rather than the exception. Even where the loan is a high percentage of the purchase price, and even when the loan term is extended, including arrangements under which a "balloon" of principal remains when the debt falls due, this system constantly reduces the balance of principal and increases the equity interest of the owner, thus placing both borrower and lender in a better position to recast the mortgage balance in difficult economic periods when the owner cannot manage to meet the monthly payments. This factor has the influence of reducing the incidence of foreclosures, reducing the number of parcels on the market for sale at any one time, and thereby helps to sustain real estate values generally to the benefit of both borrower and lender.

Most regulated lending institutions are required to take steps to protect their loans in cases of defaults continuing for specified periods. Procedures that would allow the lender to sue for the defaulted installments,

instead of accelerating all the remaining balance and foreclosing (which is what N.J.S. 2A:50–2 forces them to do) would put the loan back in good standing and avoid foreclosure. It is obviously easier to pay up a few hundred dollars than it is to pay up many thousands.

The subject is not without controversy, and sharply differing views have been expressed. See, for example, 86 N.J.L.J. 572 (1963) ("Note or Bond with Mortgage—Whither the Difference?"); 92 N.J.L.J. 452 (1969) ("Due Process and Rulemaking"); 92 N.J.L.J. 593 (1969) (Text of suspended Rule 4:64–5); 92 N.J.L.J. 761 (1969) (Report of the Supreme Court's Committee on Rules); 92 N.J.L.J. 793 (1969) (Proposal to Adopt Rule 4:64–5 Evokes Criticism); *Schwartz v. Bender Investments, Inc.,* 58 N.J. 444, 279 A.2d 100 (1971).

In any event, it is clear in this case that the mortgage debtor cannot object to the joinder of the foreclosure and deficiency claims in a single action, and cannot claim as of right an offset for "fair value" under N.J.S. 2A:50–3. But that does not end the matter.

Under the federal rule, a "fair value" offset may be allowed under proper circumstances where the equity of the circumstances require it. See, for example, *U. S. v. Wells,* 403 F.2d 596, at 598 (CA 5, 1968).

In this case, the foreclosure sale produced no bidders at all, and as a result there was no sale in fact. The record at the trial did not pin down what the reason for this was. Neither the borrower nor the lender bid. It may be that accumulated and unpaid real estate taxes, a claim that has priority over the mortgage lien, were themselves more than anyone would be willing to bid for the property subject to the taxes.

The mortgage debtor presses the claim that the United States delayed foreclosure for some 15 months, and that in the hands

---

**2.** See N.J.P.L.1967, c. 304, N.J.S.A. 55:17–1, *et seq.,* for a statute providing wide flexibility of remedy in örder to assure financial feasibility on redevelopment and renewal projects and to encourage private financing.

of a grantee from the mortgage debtor, who evidently "milked" the property by collecting rents and paying no bills, the property was allowed to run down and deteriorate and eventually became vacant and was vandalized.

■ But the obligation to keep the property that secures the loan in good repair is the obligation of the borrower, not the lender. In this case, the borrower sold the property (along with others in the neighborhood) to another, subject to this mortgage (whose payment was not assumed) and took back a second mortgage. Thus, there was not only an obligation to keep the property in repair as security for this mortgage, but a personal pecuniary interest in doing so to protect the second mortgage.

As holders of the second mortgage, the borrowers had an explicit right under its terms to enter into possession, collect rents, and the like. They could have done everything that they claim the United States could have done as holder of the first mortgage, and beyond that they had the primary obligation to the United States to keep the property in repair. The various equitable defenses raised are accordingly found to be without substance in fact or law.

In respect to the claim for fair value offset, on equitable considerations, this claim must also fall. One of the factors that must be shown to invoke it is that the borrower lacked the financial resources to protect himself at the sale. See, *Federal, etc. v. Lowenstein,* 113 N.J.Eq. 200, 166 A. 538 (Ch.1933); *79–83 Thirteenth Ave., Ltd., v. De Marco,* 79 N.J.Super. 47, 190 A.2d 391 (Law, 1963), at pp. 58–59. The affirming opinion in the Supreme Court felt that less than all the criteria of *Lowenstein* should be insisted on, noting that they were derived from the economic conditions of a depression era. And it said:

> "Today they have lost a good part of their pertinency. General economic conditions are the reverse of those in the 30's. Times are booming, mortgage loan funds for refinancing are plentiful and lenders are competing for investments. There is an active market for most kinds of real estate and judicial sales attract prospective purchasers who bid competitively for many properties." 44 N.J. at 535, 210 A.2d at 406.

That has not been the situation in the area of the mortgaged property for quite some time, and it is far from the situation today. But aside from that, whether the times be booming or depressed, the one criterion which must obviously be shown to justify a fair value offset is that the borrower was unable, by the use of assets or credit, to pay the debt or refinance it. If the borrower is able to pay or refinance, he has no equity in his favor without regard to existing economic conditions. No fair value offset can be allowed here for lack of any evidence to establish this essential element.

If there was to be a fair value offset, the court would allow no more than $1,750., rather than the sum claimed.

The only evidence of fair value offered at the deficiency trial was an appraisal report presented by the mortgage debtor. The position of the United States was that since no bid was made, the property had no value.

The appraiser's method was to take five comparable sales in the area, adjust for differences in the sizes of the buildings as reflected by total rentable square feet, and determine what the mortgaged property value would be if it was in essentially the same condition as the comparable sales. He then listed the expense items for making repairs to bring the mortgaged property to that level, and subtracted that cost to arrive at a figure reflecting the value without repairs.

The basic methodology is an acceptable (though not conclusive) one for estimating value, but in adjusting each comparable sale to reflect differences in size, the appraiser used arbitrary percentages bearing no relationship to the relative square foot areas of rentable space. He provided no data to support his adjustments.

Using the underlying data provided in the appraisal, the court has calculated the "repaired value" of the mortgaged property on a direct ratio of rentable square feet.

The 5 values so obtained were then averaged, and from the average the cost of repair was deducted. The court finds on the evidence that the fair value of the unrepaired property at the date of the foreclosure sale was no more than $1,750. gross.

From this figure there must be deducted the aggregate of unpaid real estate taxes and interest at that date, since the taxes and interest would have to be paid by the bidder to get clear title. If the taxes due and to become due by the time the property was repaired and rented came to $1,750 or more, there would be no offset at all.

Submit judgment in accordance with this opinion.

The foregoing opinion shall constitute the findings of fact and conclusions of law, pursuant to F.R.Civ.P. 52.