917 F.2d 812
 135 L.R.R.M. (BNA) 2760, 54 Fair Empl.Prac.Cas. 136,
55 Empl. Prac. Dec. P 40,370, 59 USLW 2312,
63 Ed. Law Rep. 738,
36 Cont.Cas.Fed. (CCH) 75,959, 1 A.D. Cases 1704
 BOARD OF GOVERNORS OF the UNIVERSITY OF NORTH CAROLINA;
University of North Carolina, at Asheville; The
North Carolina School of the Arts,
Plaintiffs-Appellees,
v.
UNITED STATES DEPARTMENT OF LABOR; Elizabeth H. Dole,
Secretary of Labor; United States of America,
Defendants-Appellants,
Women's Legal Defense Fund; American Association of
University Women; Equal Rights Advocates; Mexican-American
Legal Defense and Education Fund; Mexican-American Women's
National Association; National Association of Commissions
for Women; National Council of La Raza; National Council
of Negro Women, Incorporated; National Institute for Women
of Color; National Organization for Women; Now Legal
Defense and Education Fund; National Women's Law Center;
National Women's Political Caucus; NC Equity; Northwest
Women's Law Center; Organization of Pan Asian American
Women, Incorporated; Wider Opportunities for Women; Women
and Employment, Incorporated; Women Employed; Women's Law
Project; YWCA of the USA; Equal Employment Advisory
Council, Amici Curiae.
 No. 89-3359.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1990.
Decided Oct. 26, 1990.
 
 Irving Gornstein, U.S. Dept. of Justice, argued, James P. Turner, Acting Asst. Atty. Gen., David K. Flynn, U.S. Dept. of Justice, Robert P. Davis, Sol., James D. Henry, Associate Sol., Joseph M. Woodward, Deputy Associate Sol., Diane A. Heim, Counsel for Litigation, U.S. Dept. of Labor, on briefs, Washington, D.C., for defendants-appellants.
 Thomas J. Ziko, Sp. Deputy Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., argued, Lacy H. Thornburg, Atty. Gen., Edwin M. Speas, Jr., Sr. Deputy Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., on briefs, for plaintiffs-appellees.
 Gregg H. Levy, T. Jeremy Gunn, Covington & Burling, Washington, D.C.; Claudia Withers, Donna Lenhoff, Women's Legal Defense Fund, Washington, D.C., for amici curiae The Women's Legal Defense Fund, American Ass'n of University Women, Equal Rights Advocates, Mexican-American Legal Defense and Educ. Fund, Mexican-American Women's Nat. Ass'n, Nat. Ass'n of Commissions for Women, Nat. Council of La Raza, Nat. Council of Negro Women, Inc., Nat. Institute for Women of Color, Nat. Organization for Women, NOW Legal Defense and Educ. Fund, Nat. Women's Law Center, Nat. Women's Political Caucus, NC Equity, Northwest Women's Law Center, Organization of Pan Asian American Women, Inc., Wider Opportunities for Women, Women and Employment, Inc., Women Employed, Women's Law Project, and YWCA of the U.S.
 Robert E. Williams, Douglas S. McDowell, Salvador T. Perkins, McGuiness & Williams, Washington, D.C., for amicus curiae Equal Employment Advisory Council.
 Before WIDENER and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 CHAPMAN, Circuit Judge:
 
 
 1
 On this appeal, we must decide whether the Acting Secretary of Labor erred in ruling that, for the purposes of the federal contract compliance laws, the University of North Carolina system constitutes a single, unified state agency, of which the University's campuses are merely sub-agencies. This question is pertinent because it will determine whether, because of their affiliation with the University, the campuses that have not entered contracts with the federal government must, nonetheless, submit to the compliance reviews conducted by the Office of Federal Contract Compliance Programs. We hold that, because of the peculiarities of the statutory scheme creating the University of North Carolina, for the purposes of the federal contract compliance laws, the University is, indeed, a single state agency and, because of their connection with that agency, the non-contracting campuses must submit to compliance reviews, regardless of whether they are direct participants in any federal contract. We therefore reverse the judgment of the district court.
 
 I.
 
 2
 The laws of North Carolina provide that the Board of Governors of the University of North Carolina (UNC) "shall be known and distinguished by the name of 'the University of North Carolina.' " N.C.Gen.Stat. Sec. 116-3. UNC is constituted as a "body politic and corporate," id., and is composed of 16 "constituent institutions" or campuses. Id. Sec. 116-4. UNC's Board of Governors is "responsible for the general determination, control, supervision, management and governance of all affairs of the constituent institutions." Id. Sec. 116-11. In executing these statutorily imposed duties, the Board maintains substantial control over many of the activities of the campuses: it determines each campus' academic mission and enrollment level; it sets the tuition for each campus; it prepares one budget for the entire university system; and it appoints each campus' senior administrative staff and tenured faculty. Id. The Board also selects the President of UNC, the University's "chief administrative officer." Id. Sec. 116-14.
 
 
 3
 A separate chancellor and board of trustees govern each of the individual UNC campuses. The board of trustees of each campus exercises those powers that the Board of Governors has delegated to it. Id. Sec. 116-33. Each chancellor enjoys executive authority over the affairs of his campus and may act "subject to the direction of the President." Id. Sec. 116-34. The statutes creating UNC contemplate very broad delegations of authority to the boards of trustees and the chancellors of the different campuses. The Board of Governors may delegate "any part of its authority over the affairs of any [constituent] institution to the board of trustees or, through the President, to the chancellor." Id. Sec. 16-11(13). However, the Board of Governors retains ultimate control over the affairs of the campuses since any delegation of authority "may be rescinded by the Board at any time in whole or in part." Id.
 
 
 4
 The President of UNC has established procedures that campuses must follow when applying for federal contracts. For contracts that fall into five specified categories, a bidding campus must secure the President's approval before submitting a proposal.[1] For all other contracts, the procedures provide that a campus may bid without the President's prior approval, but the campus must send a copy of its contract proposal to the President who may, at any time, withdraw, revise, or amend it. Under these contract procedures, eleven of UNC's sixteen campuses have entered contracts with the federal government. The North Carolina School of the Arts (NCSA) and the University of North Carolina-Asheville (UNC-A) are two of the campuses that have not.
 
 
 5
 Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 793,[2] section 402 of the Vietnam Era Veterans Readjustment Assistance Act, 38 U.S.C. Sec. 2012,[3] and section 202 of Executive Order 11246[4] impose certain nondiscrimination and affirmative action obligations on parties to federal contracts. The two pieces of legislation impose these obligations on "part[ies] contracting with the United States," while the injunction in the executive order is directed at "the contractor." The Office of Federal Contract Compliance Programs (OFCCP) in the Department of Labor is charged with conducting periodic reviews of entities that have contracted with the government to ensure that the contractors have complied with their non-discrimination and affirmative action obligations. 41 C.F.R. Secs. 60-1.20, 60-250.25, 60-741.25. In 1981, UNC-A and NCSA refused to submit to one of these compliance reviews, taking the position that, since they had entered no federal contracts, the statutes and the executive order imposed no affirmative action obligations on them and the OFCCP was therefore without authority to require them to submit to a review. Seeking to compel the campuses to submit to a compliance review, the OFCCP filed an administrative complaint against them.
 
 
 6
 The administrative proceeding culminated when the Acting Secretary of Labor ruled that the "University of North Carolina is, by definition, one agency, not sixteen separate independent agencies." The Acting Secretary reasoned that, when a UNC campus is awarded a contract, UNC is properly viewed as the contractor: "[t]he constituent institutions are capable of entering into contracts only as agents of UNC because, under state law, only UNC, and not the constituent institutions, is a corporate body with the power to contract." Once UNC becomes the contractor, the Acting Secretary ruled, all of the constituent campuses are obligated to submit to compliance reviews. Although UNC has delegated contracting authority to its campuses, the Acting Secretary reasoned that such delegation does not transform the campuses into independent agencies: they continue to contract as agents of UNC. The Acting Secretary ordered the two non-contracting campuses to submit to review, stating that their refusal to do so would result in the cancellation of all of UNC's federal contracts.
 
 
 7
 UNC sought review of the Acting Secretary's ruling in the U.S. District Court for the Eastern District of North Carolina. The court held that only those UNC campuses that had entered federal contracts were subject to OFCCP's review authority. In reaching this decision, the court relied heavily on Department of Labor regulations implementing the statutes and the executive order.[5] Those regulations define the term "government contract" as an agreement "between any contracting agency and any person" for supplies, services, or property. See, e.g., 41 C.F.R. Sec. 60-1.3. For the purposes of this definition, the regulations define "person" to include "any natural person, corporation, partnership, unincorporated association, State or local government, and any agency, instrumentality, or subdivision of such a government." Id. The court held that the plaintiff UNC campuses were not contractors in their own names, nor were they an " 'agency, instrumentality, or subdivision' of a 'person' which is a party to a government contract." This holding turns on the district court's observation that the Board of Governors has delegated to the constituent institutions the power to contract. The court held that only the campuses that had actually entered federal contracts qualified as contractors and were subject to OFCCP's compliance reviews. 722 F.Supp. 1301. The Secretary of Labor has appealed to this court.
 
 II.
 
 8
 As a preliminary matter, we must determine what, if any, level of deference to accord to the Acting Secretary's view of the statutory scheme creating the University of North Carolina. The Acting Secretary inquired into the nature of the scheme in order to determine whether, by virtue of the University's unitary nature, the contracts of certain UNC campuses conferred jurisdiction on OFCCP to conduct compliance reviews of non-contracting campuses. A fundamental precept guiding the judicial review of agency action is that the reviewing court owes substantial deference to an agency's construction of the statutes that it is charged with administering. Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984); Blum v. Bacon, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). This holds true as well for an agency's determination of its own jurisdiction when that determination turns on the agency's findings of fact. See O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951); Michigan Mutual Liability Co. v. Arrien, 344 F.2d 640, 645-46 (2d Cir.1965). This, however, was not the nature of the jurisdictional determination of the Acting Secretary with which we are here presented.
 
 
 9
 Here, the agency's determination of its jurisdiction was premised on its construction of a state statute and, as such, it is not entitled to the weight that we would normally accord to agency jurisdictional rulings. The policies of legislative delegation, see Schweiker v. Gray Panthers, 453 U.S. 34, 43-44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981), and agency competence, see United States v. Shimer, 367 U.S. 374, 382-83, 81 S.Ct. 1554, 1560-61, 6 L.Ed.2d 908 (1961), that militate in favor of the doctrine of administrative deference give way when the question before an agency no longer involves issues on which the agency's expertise gives it a special competence. In those instances where an agency has ruled on a question of law outside of its area of expertise, we no longer defer to the rulings of the agency, but instead conduct the more searching inquiry of de novo review. With this standard in mind, we now turn to the question before us.
 
 III.
 
 10
 Our inquiry centers on the legislative scheme under which UNC and its campuses are organized. We hold that the North Carolina statute, discussed above, supports the Acting Secretary's conclusion that UNC "is, by definition, one state agency, not sixteen separate, independent agencies." The statute constitutes the Board of Governors of UNC as "a body politic and corporate." N.C.Gen.Stat. Sec. 116-3. It does not grant this status to any of the sixteen campuses that the Board administers. Under the statute, only the Board of Governors is "capable in law to sue and be sued." Id. The statute further provides that UNC "shall be composed of" the constituent institutions and it expressly states that the "North Carolina School of Arts is a part of the University of North Carolina." Id. Secs. 116-4, 116-65.
 
 
 11
 There is no doubt, as UNC argues, that the individual campuses enjoy a substantial measure of autonomy; they operate largely free from the control of the Board of Governors. The record clearly shows that, on a day-to-day basis, the operations of the two campuses here in question are determined primarily by their respective chancellors and boards of trustees. This is true, however, because of the independence that the Board has allowed to the campuses, and not because of any autonomy with which they are inherently endowed under the relevant statutes. The Board of Governors is charged with the "general determination, control, supervision, management and governance of all affairs of the constituent institutions." Id. Sec. 116-11(2). Under the statute, the Board possesses broad authority to "delegate any part of its authority over the affairs of any institution to the board of trustees or, through the President, to the chancellor of the institution." Id. Sec. 116-11(13). A delegation of the Board's power to the campuses does not deprive the Board of control over the campuses' activity with which the delegation is connected. Instead, the statute provides that "[a]ny delegation of authority may be rescinded by the Board at any time in whole or in part." Id. The statute also provides that the chancellor of each campus acts "subject to the direction of the President." Id. Sec. 116-34(a). Regardless of any authority that the Board of Governors may have delegated to the constituent campuses of UNC, the Board retains ultimate control over the campuses' activity through its unlimited power to rescind any delegation.
 
 
 12
 The power relevant to this appeal is the Board's power to contract. Under procedures established by the President of UNC, the various campuses enjoy substantial independence in their ability to enter into contracts. Subject to the limitations set out in note 1, supra, each UNC campus may bid for contracts--including those with the federal government--without the prior approval of either the President or the Board of Governors. However, the President always retains the authority to withdraw, revise, or amend a campus' contract proposals after they have been submitted. Consistent with the structure of the statutes creating UNC, the campuses exercise their delegated power to contract subject to the review of the President. Theirs is not an unbounded power to contract, but rather one circumscribed by any limitations that the President or the Board of Governors may choose to place on it. This is not the description of a university system in which the campuses are properly viewed as independent agencies. It is one which, as the Acting Secretary ruled, is comprised of a single agency of which the campuses are merely constituent parts.
 
 
 13
 We draw further support for our holding from an examination of the North Carolina Supreme Court's decision in Student Bar Ass'n v. Byrd, 293 N.C. 594, 239 S.E.2d 415 (1977). There the court ruled that the state's Open Meetings Law, N.C.Gen.Stat. Sec. 143-318.2, did not require that the meetings of the law school faculty at UNC-Chapel Hill be open to the public. The statute in question applied to "[a]ll official meetings of the governing and governmental bodies" of the state. In a passage with singular applicability to the case at bar, the court held that the statute did not require the opening of meetings of the law school faculty since the faculty did not qualify as a "governing body":
 
 
 14
 The faculty of the School of Law are employees of the Board of Governors, authorized by the Board to make certain determinations with reference to the day-to-day operation of the School of Law, but all such determinations by the faculty are subject to the power of the Board of Governors to modify or reverse them. The fact that such superior power is rarely used by the holder of it does not abrogate it. Thus the faculty of the School of Law is not the "governing body" of the School of Law. The "governing body" is the Board of Governors.
 
 
 15
 293 N.C. at 602, 239 S.E.2d at 421.
 
 
 16
 In dicta, the court further stated that the opening of faculty meetings to the public might place the Law School in violation of the Family Educational Rights and Privacy Act, 20 U.S.C. Sec. 1232g(b)(1), which provides that "[n]o funds shall be made available ... to any educational agency or institution which has a policy or practice of permitting the release of educational records ... of students without the written consent of their parents." Speaking of the effect of such a violation, the court noted the "possibility that all further Federal financial aid to the entire University of North Carolina, including all its component institutions, [might] be jeopardized by an interpretation of the Open Meetings Law making it applicable to meetings of the faculty of the School of Law." 293 N.C. at 599, 239 S.E.2d at 419 (emphasis added). Clearly implicit in this statement is the notion that all of the component institutions of UNC constitute a single "educational agency or institution."
 
 
 17
 We are unpersuaded by UNC's argument that the Acting Secretary's decision in this case would open to OFCCP review a state's entire administrative structure whenever one state agency has entered a federal contract. An examination of the statutes creating the University of North Carolina clearly reveals that its components are significantly more closely related than are the independent state agencies to which UNC analogizes them in its argument. We are confident that our decision today will not be construed in the future to permit OFCCP review of a state's department of social services based solely on the federal contracts that the state's university has entered. Furthermore, even if our holding could be construed to support such a result, Department of Labor regulations would prevent it. The Department has issued regulations implementing the contract compliance laws that state that
 
 
 18
 [t]he requirements of the affirmative action clause in any contract or subcontract with a state or local government (or any agency, instrumentality or subdivision thereof) shall not be applicable to any agency, instrumentality or subdivision of such government which does not participate in work on or under the contract or subcontract.
 
 
 19
 See, e.g., 41 C.F.R. Sec. 60-1.5(a)(4). Clearly, an "agency, instrumentality, or subdivision" of the state government that was "not participat[ing] in work on or under the contract" would not be subject to OFCCP's review authority. At the same time, however, this regulation does not operate to exempt the non-contracting campuses of UNC because the state statutory scheme constitutes them as mere components of UNC, rather than as an "agency, instrumentality, or subdivision of [state] government" that is independent of UNC.
 
 IV.
 
 20
 We hold that the Acting Secretary of Labor was correct in concluding that the UNC system was a single state agency of which the complaining campuses are merely parts and that the non-contracting campuses therefore fell within OFCCP's review jurisdiction. Although eleven of UNC's sixteen campuses have, in their own names, bid for and received federal contracts, they have done so subject to the power of review that UNC's Board of Governors and President have retained over their actions. In ruling that the campuses that had entered federal contracts had done so as agents of UNC, the Acting Secretary merely stated what clearly appears from an examination of the relevant North Carolina statutes. Given the unitary nature of the UNC system, the Acting Secretary was justified in holding that, as a result of the entry of some constituent campuses into federal contracts, the entire UNC system became a "contractor" within the meaning of the contract compliance laws. If the Acting Secretary was correct in concluding that UNC qualifies as a "contractor," it follows a fortiori that the University's constituent campuses are open to OFCCP compliance reviews by virtue of their being components of the UNC system. This is true regardless of whether they have entered federal contracts. Accordingly, the judgment of the district court is
 
 
 21
 REVERSED.
 
 WIDENER, Circuit Judge, dissenting:
 
 22
 I respectfully dissent for two reasons which relate to the same basic proposition.
 
 
 23
 First, as the district court pointed out in its opinion, the executive order under consideration, Executive Order 11246, applies to "the contractor." As well, 29 U.S.C. Sec. 793, the Rehabilitation Act and 38 U.S.C. Sec. 2012, the Vietnam Era Veterans Readjustment Assistance Act, apply to "the party contracting with the United States." As the district court further points out, and I think correctly, N.C.Gen.Stat. Sec. 116-11(13) provides that the "Board of Governors of the university system may delegate any part of its authority over the affairs of any institution ... to the Chancellor of the institution...." So the requirement of affirmative action is tied by statute and regulation to those contracting with the United States and not to others. And under the North Carolina statute, the authority to contract has been delegated to the separate entities entering into the contracts involved. Whatever the other campuses of UNC may have done, neither UNC Asheville nor The School of the Arts has entered into any contract with the United States within the meaning of this case.
 
 
 24
 Second, and of greater consequence, the regulations of the Office of Federal Contract Compliance Programs of the Department of Labor have obviously envisioned just such a situation as that existing here and provided that
 
 
 25
 [t]he requirements of the affirmative action* clause of any contract or subcontract with a state or local government (or any agency, instrumentality or subdivision thereof) shall not be applicable to any agency, instrumentality or subdivision of such government which does not participate in work on or under the contract or subcontract.
 
 
 26
 41 C.F.R. Secs. 60-250.3(a)(4), 60-741.3(a)(4).
 
 
 27
 Since UNC Asheville and The North Carolina School of the Arts do "not participate in work on or under the contract or subcontract," under the government's own regulations, they should not be included within the "requirements of the affirmative action" clauses.
 
 
 28
 The majority holds that the just-quoted regulation does not apply to either UNC Asheville or The School of the Arts because they are "mere components of UNC" rather than an "agency, instrumentality or subdivision of ... [state] government."
 
 
 29
 I regret that I cannot agree to this distinction. Even if it might reasonably be said that neither UNC Asheville nor The School of the Arts is a "subdivision" of the government of North Carolina, which proposition I suggest is doubtful at best, it cannot be reasonably said, I think, the majority to the contrary, that UNC Asheville is not an "agency" or an "instrumentality" of state government. And the same goes for The School of the Arts.
 
 
 30
 The holding that UNC Asheville and The School of the Arts are "components of UNC" (the state owned and operated university) but are not agencies or instrumentalities of the state government is such a nice distinction that I would not embrace it. I am thus of opinion that the government's construction of its own regulation is unreasonable.
 
 
 31
 I would affirm the judgment of the district court.
 
 
 
 [1]
 The campuses must secure the President's advance approval before bidding on contracts that:
 (1) obligate the University or the campus to continue the program or activity beyond the life of the grant or to retain personnel initially employed under the contract;
 (2) involve the creation of a new organizational unit within the University or a constituent institution;
 (3) involve the planning or establishment of a new degree program or program track;
 (4) require matching funds or contributions that cannot be provided from the campus' current resource levels; or
 (5) would impede the elimination of race discrimination in the University.
 
 
 [2]
 The relevant portion of the Rehabilitation Act of 1973 provides that:
 Any contract in excess of $2,500.00 entered into by any Federal department or agency ... shall contain a provision requiring that, in employing persons to carry out such contract the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals.
 
 
 [3]
 The relevant portion of the Vietnam Era Veterans Readjustment Assistance Act provides that:
 Any contract in the amount of $10,000.00 or more entered into by any department or agency ... shall contain a provision requiring that the party contracting with the United States shall take affirmative action to employ and advance in employment qualified special disabled veterans and veterans of the Vietnam era.
 
 
 [4]
 The pertinent portion of Executive Order 11246 provides that:
 The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin.
 
 
 [5]
 See 41 C.F.R. Sec. 60-1.3 (dealing with Executive Order 11246); 41 C.F.R. Sec. 60-250.2 (dealing with Vietnam Era Veterans Readjustment Assistance Act); 41 C.F.R. Sec. 60-741.2 (implementing Rehabilitation Act of 1973). The wording of the regulations implementing the three different contract compliance laws differs slightly, but, for the purposes of our decision, the differences are not material
 
 
 *
 The italicized words appear in 41 C.F.R. Sec. 60-1.5(a)(4) as "equal opportunity." I don't think the difference in wording makes any difference either in reasoning or result. I have added italics for ease of discussion