NEW YORK CITY HEALTH AND HOS-PITALS CORPORATION; Medical Society of the State of New York; Sidney Finkel and John A. Bleski, Plaintiffs–Appellants,

v.

Cesar A. PERALES, as Commissioner of Social Services of the State of New York and Louis W. Sullivan, M.D., as Secretary of the United States Department of Health and Human Services, Defendants–Appellees.

No. 142, Docket 91–6123.

United States Court of Appeals, Second Circuit.

Argued Aug. 28, 1991.

Decided Feb. 3, 1992.

Official Statistics of the United States Dep't of Commerce (1990).

Peter F. Nadel, New York City (Rosenman & Colin, Joseph V. Willey; LeBoeuf, Lamb, Leiby & MacRae, Jay G. Safer, and Ronald J. Gizzi, of counsel), for plaintiffs-appellants.

Kay K. Gardiner, New York City, Asst. U.S. Atty., S.D.N.Y., Otto G. Obermaier, U.S. Atty., S.D.N.Y., and Marla Alhadeff, Asst. U.S. Atty., of counsel), for defendant-appellee Sullivan.

Before OAKES, Chief Judge, FEINBERG and CARDAMONE, Circuit Judges.

FEINBERG, Circuit Judge:

This case involves a challenge to New York State's elimination of the rights of health care providers to receive reasonable compensation when they treat poor Medicare patients. Plaintiff-appellant New York City Health and Hospitals Corporation is a New York public benefit corporation created by New York State. It is a principal provider of hospital services to the low-income population of the City. Plaintiff–Appellant Medical Society of the State of New York, the largest voluntary association of physicians in New York, is a non-profit corporation organized and existing under the laws of New York State. Plaintiffs-appellants Sidney Finkel, M.D., and John A. Bleski, M.D., are physicians who participate in the Medicare program; many of their patients are eligible under both Medicare and Medicaid. Defendant-appellee Cesar A. Perales is the New York State Commissioner of Social Services. Defendant-appellee Louis W. Sullivan, M.D., is Secretary of the United States Department of Health and Human Services (the Secretary). Perales concurs with the views of Sullivan as set out in his brief.

Appellants appeal from a judgment of the United States District Court for the Southern District of New York, Mary Johnson Lowe, J., dismissing plaintiffs' complaint challenging a regulation of the New York State Department of Social Services as violative of the Medicare Act, Title XVII of the Social Security Act, 42 U.S.C. §§ 1395–1395ccc, and the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq. The Medicare program provides funds that help subsidize medical care for the elderly and for certain disabled individuals. The Medicaid program subsidizes medical assistance for the poor.

Appellants claim that the regulation at issue, N.Y.Comp.Codes R. & Regs. tit. 18, § 360.10 (1988),[1] which has been approved by the Secretary, violates the Medicare and Medicaid Acts. For the reasons given below, we agree. Accordingly, we reverse

---

1. Effective March 1, 1989, 18 NYCRR § 360.10 was repealed and recodified as 18 NYCRR § 360–7.7. For purposes of consistency, the regulation will be referred to as "the Regulation."

and remand with directions to grant summary judgment for appellants.

## I. Introduction

Before addressing the merits of the controversy before us, it is important that we clarify various terms of the relevant statutes. Under the Medicare Act, the federal government provides people who are 65 years of age and older and certain disabled individuals (people who are Medicare-eligible) with an inpatient hospital insurance plan known as "Part A". 42 U.S.C. §§ 1395c–1395i–4. The Medicare Act also provides that people who are Medicare-eligible may voluntarily obtain supplementary insurance for other medical care, including certain physician services, hospital outpatient services, and other health services generally not covered under Part A. 42 U.S.C. §§ 1395j–1395w–4(j). This coverage is known as "Part B" and is the part of the Medicare statute involved in this appeal. To obtain this coverage, a Medicare-eligible person must pay insurance premiums. Once Part B coverage is obtained, the federal government pays 80% of the "reasonable costs" of outpatient hospital services and 80% of "reasonable charges" for physician services rendered to the insured. Reasonable costs and charges are established pursuant to the Medicare Act and regulations. Medicare patients themselves are responsible for paying the remaining "coinsurance" amount (20% of the reasonable costs of hospital services and 20% of the reasonable charges for physician services) and the annual deductible.

The Medicaid Act, a statute separate from the Medicare Act, provides for a joint federal and state funded system which subsidizes medical care for the needy, regardless of age. If a state decides to participate in Medicaid, it proposes a plan which must be approved by the Secretary as conforming with federal requirements. 42 U.S.C. §§ 1396a(a), 1396a(b). The plan must include, among other things, a schedule of payment rates which the state designates for the various kinds of medical care that a Medicaid patient might seek. Id. If the Secretary approves a state's plan, then the Federal government will assist the state in its reimbursement program with federal Medicaid funds. Those doctors and hospitals who are willing to treat Medicaid patients must agree to accept the designated Medicaid rate and not ask the patient to pay any money beyond that amount. 42 U.S.C. §§ 1320a–7b(d), formerly 42 U.S.C. § 1396h(d), and 42 C.F.R. § 447.15 (1989). New York State is a participant in the Medicaid program.

Returning to Medicare, the authors of the statute recognized in addressing the needs of Medicare patients that the poor Medicare-eligible (those who are eligible for Medicaid as well) generally would not be able to afford to enroll in the optional Part B Medicare coverage described above, because they would not be able to pay the insurance premiums, the 20% coinsurance and the annual deductible. The Act therefore provides, in 42 U.S.C. § 1395v, as elaborated by 42 C.F.R. § 407.40–407.50 (1990), that a state may agree to pay Part B Medicare insurance premiums on behalf of such poor elderly and disabled—whom we shall call "dual eligibles" or "crossovers"— and thereby acquire Part B Medicare coverage for them. By so doing, a state enrolls these crossovers in the Medicare Part B program just as less needy individuals enroll themselves when they individually choose to obtain Part B Medicare coverage and pay the insurance premiums. The federal government contributes funds to subsidize these state "buy-in" arrangements. New York has such a buy-in agreement with the Secretary.

Until 1987, New York paid not only the premiums but also the full cost-sharing amounts—the annual deductible and the 20% of reasonable costs or charges beyond what Medicare covers—for buy-in crossovers. Effective January 1, 1987, however, New York changed its practice by enacting the Regulation at issue in this case. The Regulation provided that in the case of crossovers covered by Part B through a buy-in agreement, New York will not pay any cost-sharing amounts except under one set of circumstances: When the 80% of reasonable costs or charges that Medicare reimburses amounts to less than the

*Medicaid* rate, New York will pay the difference (Medicaid rate minus 80% reasonable costs or charges). A letter sent by New York State to health care providers illustrates the way that the Regulation operates:

*Example:* Medicaid Fee or Rate = $45.00

| Medicare Approved | [80%] Medicare Paid | Balance Due |
|---|---|---|
| $80.00 | $63.00 | $0.00 |

A claim *should not* be submitted to Medicaid in this example.

\* \* \*

*Example:* Medicaid Fee or Rate = $50.00

| Medicare Approved | [80%] Medicare Paid | Balance Due |
|---|---|---|
| $60.00 | $48.00 | $2.00 |

A claim *should* be submitted to Medicaid for the amount of $2.00.

---

The Regulation also prohibits Medicare providers from collecting any money from buy-in dual eligibles themselves.

One effect of the Regulation is that in New York State a dual eligible's providers may almost never collect more than 80% of their reasonable costs or charges, because the scheduled Medicaid payments are almost invariably less than 80% of the corresponding reasonable costs or charges of a given type of care under Medicare.[2] The Regulation has been modified to extend to a group of Medicare-eligible patients who are not poor enough to qualify for Medicaid but have incomes at or below the poverty line. This group is referred to as "qualified Medicare beneficiaries" (QMBs). 42 U.S.C. §§ 1396d(p)(1), 1396d(p)(2)(A). The QMBs may, like dual eligibles, be provided with Part B coverage through a buy-in agreement. 42 U.S.C. § 1396d(p)(3). The modified New York regulation limits New York's contribution to QMBs' cost-sharing coverage in the same way it does that of dual eligibles, on the basis of Medicaid rates.

## II. Procedural History

This appeal arises out of a challenge to the Regulation as violative of the Medicare and Medicaid Acts. The Regulation has been approved by the Secretary. The approval was apparently not accompanied by an opinion or statement of reasons, and, we are told, was issued after commencement of this litigation. As indicated above, the Regulation became effective January 1, 1987. In the district court, plaintiffs and defendants both moved for summary judgment and defendants also moved to dismiss. While these motions were pending, Congress amended portions of the Social Security Act relevant to the action, and the parties addressed the effect of the amendments in letters to the district court. In an opinion and order dated March 18, 1991, the district court denied plaintiffs' motion and granted defendants' motions for dismissal of the complaint. The court reasoned that the Secretary's approval of the Regulation was based upon a permissible construction of the statute and that his interpretation was therefore entitled to deference. Thereafter, judgment was entered but subsequently vacated to permit plaintiffs to file an amended complaint, which included a new count based on amendments to the Medicaid Act that took effect in 1989. In April 1991, the district court entered a final judgment dismissing the amended complaint. This appeal followed.

## III. Discussion

In this action, we must determine what New York State's responsibility is under

---

**2.** Because the record reflects that this conclusion is true and appellees do not dispute it, we shall assume that it is true and that New York in most cases now pays no part of Part B cost-sharing amounts. ·

the Medicare and Medicaid Acts for the annual deductible and 20% of reasonable costs or charges for patients who are dual eligibles or QMBs.

■] Appellants claim that the Regulation violates the Medicare and Medicaid Acts and that the Secretary's approval of the Regulation is unjustified. Appellees submit that under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), we are required to defer to the Secretary's interpretation of the statute at issue unless the interpretation is "manifestly contrary" to the statute. Although we recognize, as did the district court, that the Medicare and Medicaid Acts are very complicated, this is one of those comparatively rare instances when we should not defer to an administrator's interpretation of a statute. First, as we explain below, the Regulation is at odds with the clear intent of the statutes, both facially and as elaborated by legislative history. See *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82. Second, the Secretary's policy has been inconsistent with respect to the particular question at issue, and his current position is therefore entitled to less deference.

*Medicare Act*

■ Under the Medicare Act, a provider of services to a Medicare-eligible individual pursuant to the Medicare Act receives from the federal government, after deduction of the annual deductible, 80% of the reasonable costs or charges for such services. To collect the remaining portion of the provider's compensation, the provider "may charge such [Medicare-eligible] individual or other person (i) the amount of any deduction ... and (ii) an amount equal to 20 per centum of the reasonable charges for such items and services ... for which payment is made under part B ...." 42 U.S.C. § 1395cc(a)(2)(A). In other words, providers who furnish medical care to Medicare-eligible patients have the right to collect 100% of their reasonable costs or charges. *Mercy Community Hosp. v. Heckler*, 781 F.2d 1552, 1556–57 (11th Cir.

1986); *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1472 (7th Cir.1985), cert. denied, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 228 (1985); *Menorah Medical Center v. Heckler*, 768 F.2d 292, 296 (8th Cir.1985); *Regents of Univ. of Cal. v. Heckler*, 771 F.2d 1182, 1188–89 (9th Cir.1985). As appellants note, there is nowhere articulated in the Medicare Act or regulations an exception for dual eligibles or QMBs or any limitation on providers' express statutory right to recover their full reasonable costs or charges. Despite this right, the Regulation at issue limits New York State's cost-sharing contribution to the Medicaid rate, an amount that is less than a provider's reasonable costs or charges, and prohibits providers from collecting anything from the patients themselves. In other words, the Regulation precludes providers who serve dual eligibles and QMBs pursuant to a buy-in arrangement from collecting more than 80% of their reasonable costs or charges in the overwhelming majority of cases.

The Regulation therefore appears, on its face, to violate the Medicare Act. The Secretary has nevertheless approved it, on the ground, accepted by the district court, that dual eligibles and QMBs are "primarily Medicaid patients" since they receive Part B Medicare coverage only because the State has enrolled them due to their status as Medicaid patients or poor individuals. In the Secretary's understanding, then, providers supplying care to such individuals are therefore not entitled to receive their reasonable costs or charges. We do not accept this reasoning. The Medicare Act on its face entitles providers to collect their reasonable costs or charges, an entitlement which is frustrated by the Regulation.

The Secretary's interpretation of dual eligibles as primarily Medicaid patients leads to some oddities. If Medicaid alone controlled with respect to dual eligibles, then it would make little sense for Medicare Part B to pay 80% of the Medicare rate for crossover care. If Medicaid were in fact the controlling program, then one would expect providers to be compensated at the Medicaid rate, instead of at 80% of the Medicare rate. Moreover, if crossovers

were "primarily Medicaid patients," there would be no basis for Medicare to allow (as it does), as a hospital's bad debt expense, the uncollected Medicare cost-sharing amounts.

Beyond the face of the statute, the Senate Report accompanying the initial Medicare Act reveals that Congress sought to avoid a wealth-based, two-tiered system of health care for the elderly and certain disabled and indeed wanted to integrate *all* of those who were Medicare-eligible into the existing health care system. "Since the reasonable cost of the services would be covered, hospitals would not be deterred, because of nonpaying or underpaying patients in this aged group, from trying to provide the best of modern care." S.Rep. No. 404, 89th Cong., 1st Sess. 27 (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1967–68. "The provision of insurance against the covered costs would encourage participating institutions, agencies, and individuals to make the best of modern medicine more readily available to the aged." S.Rep. No. 404, 89th Cong., 1st Sess. at 24, 1965 U.S.C.C.A.N. at 1965.

Deeming dual eligibles and QMBs to be primarily Medicaid rather than Medicare patients prevents health care providers from collecting their reasonable costs or charges. Providers will consequently refrain from treating the most vulnerable of the elderly and disabled, those who are also poor. These groups are the true subjects of this appeal, and such a result is fundamentally at odds with Congress' vision in enacting the Medicare Act.

*The buy-in provisions of Medicaid*

The statutory section that specifies cost-sharing obligations for buy-ins is 42 U.S.C. § 1396a(a). It mandates that "[a] State plan for medical assistance [Medicaid] must .... provide," id. at § 1396a(a)(10), "for making medical assistance [Medicaid] available for medicare cost-sharing (as defined in section 1396d(p)(3) of this title) for qualified medicare beneficiaries described in section 1396d(p)(1) ...." Id. at

§ 1396a(a)(10)(E). Cost-sharing is defined as Part B premiums, deductibles and the difference between the amount paid by Medicare (80%) and "the amount that would be paid under such section if any reference to '80 percent' therein were deemed a reference to '100 percent' [i.e., 20%]." 42 U.S.C. § 1396d(p)(3). The apparent meaning of this section is that the states that participate in Medicaid must allocate Medicaid funds to the enrollment of all dual eligibles and QMBs in Part B of Medicare and to the payment of 20% of reasonable costs or charges along with the annual deductibles incurred in this program.

Appellees claim that 42 U.S.C. § 1396a(a)(10)(E), quoted above, requires only that a state make Medicaid funds available (to pay cost-sharing amounts for buy-ins) up to the Medicaid rates. Appellees base this claim in part on Congress' simultaneous enactment in 1986 of § 1396a(a)(10)(E) and 42 U.S.C. § 1396a(n). The latter provision *permits* state reimbursement of cost-sharing amounts to QMBs to exceed the Medicaid rates. According to appellees, Congress would not simultaneously require (under (a)(10)(E)) and permit (under a(n)) the same result.

Although the argument has a surface appeal, upon analysis it is not persuasive. A statute requiring Medicaid funds to be made available for Medicare cost-sharing can only sensibly be read as requiring the funds to be made available to cover *all* Medicare cost-sharing. It is counter-intuitive that a statute requiring Medicaid funds to be made available for cost-sharing only to the extent of the Medicaid scheduled rates would not specify that qualification expressly. Furthermore, it appears that the reason that section a(n) authorizes payment beyond the Medicaid amount, when it is required by another section, is to clarify that the Medicaid Act [3] does not prohibit a provider from accepting more than the Medicaid rate. To ensure that it be understood that providers of care to dual eligi-

---

**3.** Specifically, 42 U.S.C. §§ 1320a–7b(d), formerly § 1396h(d), as elaborated by 42 C.F.R. § 447.15 (1989).

bles and QMBs are allowed and entitled to accept the state's full cost-sharing reimbursement, which (a)(10)(E) now mandates, a(n) gives providers this explicit authorization. As we hold today, a Medicare provider need not be satisfied with inadequate payment, i.e., less than reasonable costs or charges, even when that provider is treating a Medicare patient who happens also to be poor.

*Predecessor to § 1396a(a)(10)(E)*

To support their position that the Regulation is not contrary to the Medicare and Medicaid Acts, appellees rely on, among other things: a predecessor section to (a)(10)(E); a district court decision construing that earlier section; and legislative history. Before 42 U.S.C. § 1396a(a)(10)(E) was enacted, 42 U.S.C. § 1396a(a)(15) of the Medicaid Act governed a state's obligations to pay cost-sharing amounts for patients enrolled in Part B of Medicare under a buy-in arrangement. Although (a)(15) has been repealed, effective July 1, 1989, both parties in this case discuss it extensively. The district court's original judgment was addressed to the Secretary's interpretation of (a)(15) but this earlier judgment was vacated and the court later took into account the new (a)(10)(E) in rendering its final judgment. We shall analyze section (a)(15) for the guidance it provides in understanding the section that replaced it.

Prior to its repeal, (a)(15) required that a state Medicaid plan "provide where, under the plan, all of any deductible, cost sharing, or similar charge imposed with respect to such individual [covered by Part B under a buy-in arrangement] ... is not met, the portion thereof which is met shall be determined on a basis reasonably related ... to such individual's income or his income and resources[.]" We understand this section to mean that if the state chooses not to pay the entire cost-sharing amount, the state must pay what remains after patients are allocated that portion of the liability commensurate with their ability to pay. Appellees claim that this section is only a limitation on how much a patient may be charged but not an indication of the minimum re-

quired of a state. We disagree. If the only purpose of the section were to put a ceiling on what a buy-in patient could be charged, the section could have stated as much. The significance of the statute as written is to provide two alternatives: either a state pays all cost-sharing amounts, or the state pays all except that portion allocated to the patient based on the patient's income and resources.

This understanding is also consistent with the providers' entitlement under Medicare to receive 100% of their reasonable costs or charges. Whether the state pays these costs or charges in full or whether part is allocated to the patient based on ability to pay, the provider is compensated and is therefore encouraged to continue to treat the poor elderly and disabled. This encouragement serves the goals of the Medicare Act. To the extent that (a)(15) guides our reading of successor section (a)(10)(E), the meaning of (a)(15) is consistent with a requirement for payment of all cost-sharing amounts by the state under (a)(10)(E). At most, (a)(15) might support an argument that (a)(10)(E) incorporated the alternative of allocating a portion of liability to patients based on their ability to pay.

Appellees also rely on *Samuel v. California Dep't of Health Services*, 570 F.Supp. 566 (N.D.Cal.1983), to support the validity of the Regulation, at least under the former section (a)(15). In *Samuel*, a California district court upheld a state regulation which, like the Regulation here, limited the state's obligation to pay cost-sharing reimbursement for buy-in dual eligibles on the basis of the state's Medicaid rates. *Id.* at 574. The court also held that providers may not collect these amounts directly from dual eligibles, under what was formerly Medicaid, 42 U.S.C. § 1396h(d)(1) but has now been recodified as 42 U.S.C. §§ 1320a–7b(d). *Id.* Appellees assert that, as the court noted in *Samuel*, there was no clear intent in the legislative history of (a)(15) to protect providers by guaranteeing them reimbursement. 570 F.Supp. at 570. We disagree. Moreover, we would include in any examination of legislative history an examination of the history of the Medicare

Act, since those individuals covered by Part B under (a)(15) are Medicare patients. As we have already indicated, the Senate Report accompanying the Medicare Act evidenced an intent to provide quality medical care for the elderly by compensating providers reasonably for their care. A guarantee of reimbursement, by protecting providers, protects patients.

Finally, appellees suggest that the "subsequent legislative history" of (a)(15) reveals that (a)(15) permitted the limitation of a state's cost-sharing obligations for dual eligibles on the basis of Medicaid rates. Appellees cite, for example, the House Report on the Medicare Catastrophic Coverage Act of 1988, which noted that "with respect to dual Medicaid–Medicare eligibles, some states pay the coinsurance even if the amount that Medicare pays for the service is higher than the State Medicaid payment rate, while others do not.... [I]f a State chooses to pay some or all of the coinsurance in this circumstance [where the Medicaid rate is lower than what Medicare covers], Federal matching funds would, as under current law, be available for this cost." H.R.Rep. No. 105(II), 100th Cong., 2d Sess. 61 (1988), reprinted in 1988 U.S.C.C.A.N. 803, 857, 884. Appellees also cite the legislative history of the Omnibus Budget Reconciliation Act of 1989, in which Congress recognized that most states limit reimbursement for dual eligibles to the Medicaid rate. H.R.Rep. No. 247, 101st Cong., 1st Sess. 364 (1989), reprinted in 1989 U.S.C.C.A.N. 1906, 2089–90.

■ As appellants rightly contend, the Committee reports cited, written more than 20 years after enactment of the Medicare and Medicaid Acts, do not mention or purport to construe (a)(15). They merely refer to what the Committee understood to be the *practice* of some states concerning payment of cost-sharing amounts. Furthermore, even when a subsequent House Committee has actually commented upon an earlier statute, the interpretation carries little weight with the courts. See *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979); *Pierce v. Underwood*, 487 U.S. 552, 566,

108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988); *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960). We accordingly refuse to read the subsequent legislative history which appellant cites as evidence that the Regulation is valid, under either the former (a)(15) or the current (a)(10)(E).

*Inconsistency of the Secretary's policy*

■ As we stated above, where—as here—an issue is a question of law involving statutory construction and analysis of Congressional intent, and the meaning of the statute is clear, an agency interpretation is entitled to less deference. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446–48, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987); *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9; *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 816 F.2d 761, 764 (D.C.Cir.1987). But even where a statute is ambiguous or silent on a particular question—as we do not believe the Medicare and Medicaid statutes are with respect to the question before us— where the Secretary's policy is inconsistent with an earlier policy, that inconsistency is a ground for rejecting a claim for deference. In *Cardoza–Fonseca*, for example, the Supreme Court stated that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." 480 U.S. at 446 n. 30, 107 S.Ct. at 1221 n. 30 (citations omitted). In *Samaritan Health Service v. Bowen*, the Court of Appeals for the D.C. Circuit struck down as unreasonable the Secretary's interpretation of a provision of Medicare, an interpretation that had led to the denial of Medicare reimbursement claims. The court stated in its opinion that "[a]ny deference that an interpretive rule may claim depends on [among other things] ... 'its consistency with earlier and later pronouncements ....'" 811 F.2d 1524, 1529 (D.C.Cir.1987), citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). The expertise in statutory interpretation to which we normally

defer becomes dubious when the expert cannot make up its own mind.

This case presents an example of such inconsistency. Although appellees assert that the Secretary's approval of the Regulation accords with his longstanding policy, this assertion is not entirely accurate. In a 1981 policy memorandum, the Secretary announced that with respect to dual eligibles who have buy-in Medicare coverage, "if the MediCal [Medicaid] agency has made no payment at all, the physician/supplier may collect coinsurance [i.e. 20% of reasonable charges] and deductibles from the MediCal [Medicaid] eligible patient." Department of Health & Human Services Memorandum, September 29, 1981 (emphasis added). As we stated above, under the New York Regulation, the providers for most dual eligibles and QMBs who have buy-in Part B coverage will receive nothing from Medicaid because the 80% which Medicare pays will exceed the Medicaid rate. Therefore, the providers for these buy-in patients would have been authorized, under the Secretary's 1981 policy, to collect coinsurance from their patients directly. In *Samuel*, the California district court case we discussed above, the Secretary urged this position with the State of California:

> Suppose, however, the doctor chooses not to bill MediCal [Medicaid] but only Medicare. In that case the doctor, depending on his conscience, may take his 80% reimbursement from Medicare and bill the beneficiary the remaining 20%. Note that this is totally outside the State plan and beyond the reach of any proscriptions which might be imposed under the Medicaid Act; *whether the doctor bills the patient in the Medicare-only situation is a matter between the doctor and his*

patient. The State cannot control physicians and cannot stop them from billing certain *charges permitted by the federal government.* (emphasis added)

Similarly, the Secretary there asserted:

> What the plaintiffs are really complaining about is the practice of some doctors in charging co-payments to their patients. *Congress has seen fit to allow the doctors discretion to impose such charges and if plaintiffs are unhappy about it their remedy is to seek corrective legislation.* (emphasis added)

Thus, in 1981 the Secretary presumed that providers have the right to receive 100% of their reasonable costs or charges for services to patients enrolled in Part B Medicare pursuant to a buy-in arrangement, a right that providers could assert even against indigent, Medicaid-eligible patients. The Secretary did not consider such patients to be "primarily Medicaid" in 1981. We reject the Secretary's reading of the statutes to suggest that these patients are "primarily Medicaid" in 1991.[4]

## IV. Conclusion

When faced with a complicated statutory scheme, there is a strong temptation for judges to assume that the scheme has no fixed meaning or purpose and simply to defer to the interpretation given the statutory text by an administrative agency. In a society as complex as ours, many statutes are of necessity complicated. However, complexity is not the same as ambiguity. Congress passes legislation with specific purposes in mind. When the ordinary tools of statutory construction permit us to do so, we must attempt to discover those purposes from the text, structure and

---

**4.** It is true that in Chevron, the Federal Agency at issue—the E.P.A.—had adopted different policies with respect to the definition of "stationary source" under the Clean Air Act from one administration to the next. See *Chevron*, 467 U.S. at 863–64, 104 S.Ct. at 2792. However, these policies were both within the policy-making authority implicitly delegated by Congress to the agency in flexibly implementing its statute. In our case, by contrast, the position that Medicare providers are entitled to collect their fees from dual eligibles (the Secretary's position in 1981) is absolutely at odds with the position that the

providers are bound to accept only the Medicaid scheduled amount for dual eligibles (the Secretary's position in 1991). Congress intended either that buy-in patients be responsible for cost-sharing or that they not be responsible for cost-sharing. The Secretary changed policies not because he found that one of two permissible policies was more desirable in implementing the unspoken intent of Congress. The Secretary changed because, as he submits in his brief, he now believes that the previous policy was in error.

history of the acts in question. Sometimes we will find that Congress has not addressed the problem posed by a particular case. In such circumstances, we are required to defer to administrative expertise. But where we confront a statute that evinces a legislative purpose clearly at odds with the proffered administrative interpretation, we should not defer. Indeed, our constitutional duty to interpret the law requires us to effectuate the legislative intent notwithstanding the contrary administrative view.

We have considered all of appellees' arguments and, for the reasons set forth above, we reverse the judgment of the district court and remand with directions to grant summary judgment to appellants.

CARDAMONE, Circuit Judge, dissenting:

I respectfully dissent from my colleagues' conclusion that the views of the state and federal administrative officers, appellees here, are at odds with the thrust of the legislative purpose. In a climate of budgetary constraint, appellee Commissioner Perales of New York promulgated a regulation, which was approved by appellee Secretary Sullivan of the U.S. Department of Health and Human Services, that saves public money in the delivery of medical care. My colleagues find the regulation at issue contrary to both the Medicare and Medicaid Acts facially and when viewed in light of legislative history. They also believe the Secretary's policy in this area has been inconsistent and is therefore entitled to little or no deference. It is my belief that appellees each acted well within their discretionary authority and consistent with legislative aims.

The thrust of appellants' argument is that New York's 18 NYCRR § 360.10 fails to satisfy the reimbursement requirements of the Medicare Act. The Secretary, on the other hand, has determined that crossovers and QMBs are "primarily Medicaid patients," and accordingly § 360.10 need satisfy only the lesser reimbursement requirements of the Medicaid Act. The majority has adopted appellants' position as their premise, that is, crossovers and QMBs are

for all purposes Medicare beneficiaries. It is conceded that were crossovers and QMBs to be classified for all purposes as *Medicare* beneficiaries, § 360.10 would violate the Medicare Act because it operates to preclude service providers treating such dual eligibles from collecting 100 percent of their reasonable costs or charges. But since whether dual eligibles should be classified for all purposes as Medicare beneficiaries is the precise question we have been called upon to decide, it is inappropriate to adopt appellants' view as a premise. Before analyzing the manner in which § 360.10 affects reimbursement of providers treating crossovers or QMBs, it must first be determined whether that effect should be analyzed under the Medicare Act or the Medicaid Act.

### A. Deference to Administrative Agency Generally

It has long been recognized that it is inappropriate for courts to resolve competing legislative policy objectives and that latitude must therefore be accorded an agency's determination of how best to exercise the authority delegated to it. *See, e.g., Chevron USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)); *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). In the instant case the majority's statement that "there is nowhere articulated in the Medicare Act or regulations an exception for dual eligibles or QMBs or any limitation on providers' express statutory right to recover their full reasonable costs or charges" effectively places the burden on the Secretary to identify an express delegation of authority. This view ignores the well-settled standard for determining when authority has been delegated to an agency. The test is not whether the Medicare Act explicitly allows crossovers and QMBs to be classified for purposes of *Part B* service provider reimbursement as primarily Medicaid recipients. Rather, the appropriate inquiry is whether there is anything in the statutes or the legislative history clear-

ly evincing a contrary congressional purpose. *See United States v. Fulton,* 475 U.S. 657, 666, 106 S.Ct. 1422, 1427, 89 L.Ed.2d 661 (1986) (reasonable agency interpretation of statute to be upheld absent "definitive contrary legislative command"); *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782 (court may not impose its own construction of statute in place of agency's if *"Congress has not directly addressed the precise question at issue"*) (emphasis added); *accord Weeks v. Quinlan,* 838 F.2d 41, 44 (2d Cir.1988).

My colleagues' approach on this point overlooks the fact that a delegation of agency authority may be implicit rather than explicit. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. Consequently, "if the statute is *silent or ambiguous with respect to the specific issue,"* deference is warranted. *Id.* at 843, 104 S.Ct. at 2782 (emphasis added); *see also Fulton,* 475 U.S. at 666–67, 106 S.Ct. at 1428 (statute addressing "rate[s]" did not specifically address interim rates, thus deference to agency warranted). Nothing in the language of these Acts itself fairly supports an inference that Congress *specifically* intended crossover and QMB *Part B* service providers to be reimbursed at the Medicare reasonable cost/charge level. In fact, the majority's efforts to construe ambiguous and conflicting provisions of the Medicare and Medicaid Acts as precluding limiting crossover and QMB Part B service provider reimbursement to Medicaid levels demonstrate this. The majority's interpretation of these Acts simply *does not* lay out a "clear" *plan of Congress* contrary to the Secretary's construction of the same statutes.

### B. *Legislative History*

Appellants rely on legislative history that they contend demonstrates Congress' purpose to classify similarly all Medicare beneficiaries. Citing legislative history, the majority suggests that Congress wanted to avoid a "wealth-based, two-tiered system of health care" for those eligible for Medicare. The cited legislative history addresses only Medicare *Part A.* The relevant portion of the Senate report is as follows:

### A. HEALTH CARE

\* \* \* \* \* \*

The first of the two insurance programs [*i.e.,* Medicare Part A] consists of protection against the costs of hospital and related care....

\* \* \* \* \* \*

The second of the two insurance programs [*i.e.,* Medicare Part B] is a *voluntary supplementary medical insurance plan* that would cover a substantial part of the cost of physicians' services and a number of other health items and services not covered under the hospital insurance program.... The combined coverage of the two insurance plans would result in protection for the elderly of a quality that only a few older people can now afford. Most elderly people can be expected to have the protection of both of these insurance programs.

The provision of insurance [*i.e.,* Part A and Part B] against the covered costs would encourage participating institutions, agencies, and individuals to make the best of modern medicine more readily available to the aged.

\* \* \* \* \* \*

### 1. BASIC PLAN—HOSPITAL INSURANCE

\* \* \* \* \* \*

(b) Benefits

\* \* \* \* \* \*

(1) Inpatient hospital benefits

\* \* \* \* \* \*

Covered Services.—The reasonable cost of service ordinarily provided to inpatients by hospitals ... would be paid for.... Since the reasonable cost of the services would be covered, hospitals would not be deterred, because of nonpaying or underpaying patients in this aged group, from trying to provide the best of modern care ...

\* \* \* \* \* \*

Payments would not be made under the hospital insurance plan for the services of physicians ...

\* \* \* \* \* \*

2. VOLUNTARY SUPPLEMENTARY PLAN

\* \* \* \* \* \*

(b) Benefits under the voluntary supplementary plan

The voluntary supplementary plan would provide protection that *builds upon the protection provided by the hospital insurance plan.* It would cover physicians' services, additional home health visits, and a variety of other health services, not covered under the hospital insurance plan. The beneficiary would pay the first $50 of expenses he incurs each year for services of the type covered under the plan. Above this deductible amount, the plan would pay 80 percent of the reasonable costs in the case of services provided by an institution or home health agency and 80 percent of reasonable charges for other covered services, with normally 20 percent being paid by the beneficiary.

\* \* \* \* \* \*

(c) Method of payment under the voluntary supplementary plan

\* \* \* \* \* \*

... In general, under the supplementary plan a provider of services ... could charge a beneficiary the $50 deductible and 20 percent of the reasonable charges (in excess of the $50 deductible) for the covered services.

\* \* \* \* \* \*

5. ACTUARIAL COST ESTIMATES FOR THE VOLUNTARY SUPPLEMENTARY MEDICAL INSURANCE SYSTEM

\* \* \* \* \* \*

(b) Financing policy

(1) Self-supporting nature of system

The committee has recommended the establishment of a supplementary medical insurance program that can be voluntarily elected, on an individual basis, by virtually all persons aged 65 and over ...

*This program is intended to be completely self-supporting from the contributions of covered individuals and from the equal-matching contributions from the general fund of the Treasury....*

\* \* \* \* \* \*

S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code & Cong.Admin.News 1943, 1964–2011 (emphasis added).

Reading this Senate Report it is difficult to accept the majority's implicit assertion that the legislative history "clearly" shows Congress aimed for crossover and QMB *Part B* service providers to be reimbursed by the state at the Medicare reasonable cost/charge level. Quite the contrary, to the extent that Congress desired to ensure reasonable cost/charge reimbursement in order to encourage "the best of modern care," such concern seems to have been directed to the Part A program. This is understandable. As the legislative history indicates, Congress distinguished between the services covered under Part A and Part B, probably based on the varying "medical necessity" of the services covered. *Compare id.* at 1966–69, *with id.* at 1982–83; *see also id.* at 2019–20; *cf. Schweiker v. Hogan,* 457 U.S. 569, 590, 102 S.Ct. 2597, 2610, 73 L.Ed.2d 227 (1982) (public assistance programs often cannot provide everyone with meaningful benefits in equal measure). From this distinction it follows that the legislature's desire to ensure reasonable cost/charge reimbursement in order to encourage the best of medical care as to Part A services does not control in the context of the "less medically necessary" services covered in Part B. Moreover, the legislative history demonstrates that in discussing the Part B program Congress envisioned coinsurance, deductible and premium payments would be made by the beneficiary. In light of the fact that crossovers and QMBs cannot pay such charges, it is disingenuous to suggest that in discussing full reasonable cost/charge reimbursement for Part B service providers Congress had within its contemplation crossovers and

QMBs. *See Chevron,* 467 U.S. at 862, 104 S.Ct. at 2791.

The dichotomy between the Part A and Part B programs with respect to dual eligibles is also logical in light of the programs' differing qualification requirements. A Medicare beneficiary—either pure or dual eligible—is automatically entitled to Part A services. Consequently, classifying dual eligibles differently than pure Medicare beneficiaries with respect to Part A services would be arbitrary, insofar as their status as dual eligibles is irrelevant with respect to their entitlement to such services. But neither pure nor dual eligible Medicare beneficiaries are automatically entitled to Part B services. A pure Medicare beneficiary is entitled to Part B services because he or she pays the enrollment premiums; a dual eligible is entitled to such services because—by virtue of his or her status as a Medicaid recipient—the state pays the enrollment premiums. Thus, there is a difference between pure and dual eligible Medicare beneficiaries in respect to Part B services. *See Schweiker,* 457 U.S. at 588, 102 S.Ct. at 2609 (inconsistent to require comparable treatment among two groups participating in a program when one group may be excluded entirely from participation).

The majority's concern that crossovers and QMBs not be deprived of important medical care is misplaced. First, it does not follow that because crossover and QMB Part B service providers are reimbursed at the Medicaid rather than the Medicare rate there will be inadequate financial incentive to provide such care. Although admittedly with less incentive fewer providers will offer such care, that is not the crucial question. What is critical is whether reimbursement at the Medicaid level is so low that an "insufficient" number of providers will have a financial incentive to provide services. *See* 42 C.F.R. § 447.204. Nothing in the record supports such a dire conclusion. *See Samuel v. Cal. Dep't of Health Servs.,* 570 F.Supp. 566, 573–74 (N.D.Cal.1983); *see also Mass. Medical Soc'y v. Dukakis,* 815 F.2d 790, 794–95 (1st Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987) (upholding state statute forbidding doctors to bill Medicare patients for fees beyond those reimbursed by Medicare against challenge based on theory that doctors might find Medicare "reasonable" charge unreasonably low, thereby refusing to treat Medicare patients). Moreover, the disincentive theory seems intuitively untenable since, were it true, no doctors or hospitals would ever treat Medicaid patients.

Second, as a result of the majority's holding, it appears if it cannot afford to provide reimbursement up to the Medicare level, New York now has the following three options: (1) permit service providers to bill crossovers and QMBs directly for the coinsurance and deductible amounts—as with pure Medicare beneficiaries. But because, unlike pure Medicare beneficiaries, crossovers and QMBs are by definition unable to pay even the Part B enrollment premiums on their own, this option will not "help" these beneficiaries; (2) discontinue its payment of Part B enrollment premiums for crossovers and QMBs. This option also will not help to ensure that these individuals receive the "best of medical care;" or (3) simply terminate enrollment in the Part B program for dual eligibles and provide the same services for them directly under the umbrella of the Medicaid program. *See Samuel,* 570 F.Supp. at 573. In that case those providing the services would be reimbursed only at the Medicaid rate and the recipients would receive precisely the same care as presently. Thus, it appears that in focusing on the fact that the services at issue are nominally part of the Medicare program—rather than recognizing that the beneficiaries actually receive these services through the Medicaid program—the majority has elevated judicial form over the substance of what the State of New York is doing and continues to have the option to do.

Further, in relying on the legislative history, my colleagues fail to cite provisions of the 1965 Senate Report that support the proposition that Congress did not aim to *require* crossover and QMB Part B service providers be reimbursed by the state at the

Medicare rate. In discussing the Medicaid Act, the report states:

No deduction, cost sharing or similar charge may be imposed with respect to inpatient hospital services furnished under the plan. This provision is related to another provision in the bill which *requires States to pay* reasonable costs *for inpatient hospital services* provided under the plan. Taken together, these provisions give assurance that the hospital bill incurred by a needy individual [*i.e.*, Medicaid recipient] *shall be paid in full* under the provisions of the State plan ... and that the States may not expect to require the individual to use his income or resources ... toward that bill....

For any other items of medical assistance furnished under the plan, a charge of any kind *may* be imposed only if the State so chooses, and the charge must be reasonably related to the recipient's income or his income and resources. The same limitations apply in the case of any enrollment fee, premium, or similar charge imposed with respect to inpatient hospital services....

The hospital insurance benefit program included under other provisions of the bill [*i.e.*, Medicare Part A] provides for a deductible which *must be paid* in connection with the individual's claim for hospitalization benefits. The committee is concerned that *hospitalization be readily available* to needy persons and that the necessity of their paying deductibles or cost sharing shall not be a hardship on them or a *factor which may prevent their receiving the hospitalization they need. For this reason,* the committee's bill provides that *the State make provisions,* for individuals 65 years or older who are included in the [Medicaid] plan [*i.e.*, crossovers], of the cost of any deductible or cost sharing imposed with respect to individuals under the program established by the hospital insurance [*i.e.*, Part A] provisions of the bill.

*A State medical assistance plan may provide for the payment in full* of any deductibles or cost sharing under the insurance program established by Part B of title XVIII. In the event, however, the State plan provides for the individual to assume a portion of such costs, such portion shall be determined on a basis reasonably related to the individual's income, or income and resources ...

S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code & Cong.Admin.News 1943, 2019–20 (emphasis added).

Consequently, while the legislative history cited by the majority may suggest that Congress did not distinguish between pure and dual eligible Medicare beneficiaries in order to assure equal care, when read in its entirety this same history equally demonstrates Congress' purpose was limited at most to Part A services. In fact, while explicitly commanding states to pay dual eligibles' Part A cost sharing and deductible amounts (and providing its reasons for this direction), the Senate Report contains no comparable direction with respect to Part B charges, though states were free not to impose such charges on the recipient. Therefore, it seems incorrect to state that the statutes or their legislative history "clearly" or "demonstrably" indicate a specific congressional aim contrary to the Secretary's interpretation on the issue presented—whether crossover and QMB *Part B* service providers must be reimbursed by the state at the Medicare reasonable cost/charge level.

### C. *Secretary's View*

The majority further states that "where the Secretary's policy is inconsistent with an earlier policy, that inconsistency is a ground for rejecting a claim for deference." Again, this formulation of the relevant inquiry seems to me to miss the point. That an agency has changed its interpretation of the statute it is charged with administering is itself not dispositive on the question of whether deference should be accorded the new interpretation. *See, e.g., Chevron,* 467 U.S. at 863–64, 104 S.Ct. at 2792. What is more important is whether the agency's change in position rests on a "well-considered basis." *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 355–56, 109 S.Ct. 1835, 1848, 104

L.Ed.2d 351 (1989). In the instant case, the Secretary having been advised by the District Court for the Northern District of California in *Samuel* that he erroneously discerned Congress' purpose provides powerful support for concluding that the Secretary's changed interpretation is well-considered. It is ironic that today's holding tells the Secretary he must forbid in New York what he has previously been ordered to permit in California.

### D. *Reasonableness*

Once it is determined that the Secretary's interpretation of the statute he is charged with administering is entitled to deference because of an implicit delegation of authority, judicial review is limited to asking whether that interpretation is "reasonable" or "permissible." *See, e.g., Clarke v. Securities Indus. Ass'n,* 479 U.S., 388, 403-04, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987); *Weeks,* 838 F.2d at 44. Because we need only ask whether the Secretary's interpretation is a reasonable or permissible construction of the statute, the fact that the Secretary's interpretation leads to "some oddities" or is in some respects "counter-intuitive" is not grounds for failing to accord it deference. *See, e.g., Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. Moreover, the reasonableness of the Secretary's interpretation should be analyzed in light not only of the purposes underlying the Medicare Act, but also with regard to the purposes underlying the Medicaid Act. *See N.Y. State Dep't of Social Servs. v. Bowen,* 846 F.2d 129, 133 (2d Cir.1988).

Medicaid is a joint state-federal program under which states choosing to participate receive federal funding to help subsidize the states' costs in providing Medicaid services. *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). Reimbursement under Medicaid need not amount to the providers' Medicare-level reasonable cost/charge. *See, e.g.,* 42 U.S.C. § 1320a–7b(d); 42 C.F.R. § 447.15. Rather, in part due to both the states' and the federal government's interest in containing Medicaid costs, *see, Schweiker,* 457 U.S. at 590, 102 S.Ct. at 2610; *State of N.Y. by Perales v. Bowen,* 811 F.2d 776, 779 (2d Cir.1987), state funding determinations need only accord with "reasonable standards ... for determining ... the extent of medical assistance under [its] plan which ... are consistent with the objectives" of Medicaid. *Harris,* 448 U.S. at 302, 100 S.Ct. at 2680 (quoting 42 U.S.C. § 1396a(a)(17)); *see also State of N.Y. by Perales v. Sullivan,* 894 F.2d 20, 22 (2d Cir.1990); 42 U.S.C. §§ 1396a(a)(13)(A), 1396a(a)(3). That general objective is *"as far as practicable,* to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services." *Beal v. Doe,* 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977) (emphasis added); *see also Alexander v. Choate,* 469 U.S. 287, 303, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985) (Medicaid provides a particular package of health services; package has general aim of assuring individuals receive necessary medical care, but the benefit provided remains individual services offered—not "adequate health care").

Thus, because of the purpose of Medicaid and its structure as a cooperative federal and state endeavor, *Harris,* 448 U.S. at 308, 100 S.Ct. at 2683, it has long been accepted that states have substantial discretion in determining the amount and scope of services to provide. *E.g., Schweiker,* 457 U.S. at 589–91, 102 S.Ct. at 2609–10; *Alexander,* 469 U.S. at 303, 105 S.Ct. at 721. Necessarily, this discretion allows the states latitude to balance medical and economic concerns in light of that state's particular circumstances in establishing Medicaid rates. *See State of Wis. Dep't of Health v. Bowen,* 797 F.2d 391, 397 (7th Cir.1986), *cert. dismissed,* 485 U.S. 1017, 108 S.Ct. 1495, 99 L.Ed.2d 883 (1988); *State of N.Y. by Perales,* 894 F.2d at 24; *Miss. Hosp. Ass'n, Inc. v. Heckler,* 701 F.2d 511, 515 (5th Cir.1983); *see also Mass. Medical Soc'y,* 815 F.2d at 795.

In this case, the Secretary was called upon to resolve the competing policy concerns expressed in the Medicare and Medicaid Acts and determine the extent to which allowing the state to limit crossover

and QMB Part B service providers to Medicaid-level reimbursement impacts upon the availability of such services for those individuals in that state in light of that state's fiscal condition. It is not up to the majority to substitute its view for the Secretary's as to how best to accommodate these concerns. *E.g., Shimer,* 367 U.S. at 383, 385, 81 S.Ct. at 1560, 1561; *Chevron,* 467 U.S. at 864–66, 104 S.Ct. at 2792–93.

In my view there simply are no compelling indications that appellees' view is wrong. Hence, I vote to affirm the district court's grant of summary judgment in their favor.